IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

WILLIAM CURTIS HOOD,           )
    Plaintiff,                 )
                          )
         v.                      )     Civil No. 3:18cv689 (MHL)
                          )
ANDREW M. SAUL,[1]              )
Commissioner of Social Security, )
    Defendant.                 )
_____ )

## REPORT AND RECOMMENDATION

On October 9, 2013, Plaintiff William Curtis Hood ("Plaintiff") protectively applied for

Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"), alleging

disability from a herniated lumbar disc, chronic low back pain, numbness in his leg, knee pain,

depression, anxiety and difficulty breathing, with an alleged onset date of January 2, 2010. The

Social Security Administration ("SSA") denied Plaintiff's claim both initially and upon

reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claim in a

written decision and the Appeals Council denied Plaintiff's request for review, rendering the

ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by: (1) failing to consider Plaintiff's attention deficit hyperactivity

disorder ("ADHD"), post-traumatic stress disorder ("PTSD") and specific learning disability in

---

[1]     On June 4, 2019, the United States Senate confirmed Andrew M. Saul to a six-year term
as the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d),
Commissioner Saul should be substituted for former Acting Commissioner Nancy A. Berryhill
as the defendant in this matter.

determining Plaintiff's severe impairments; (2) ignoring substantial evidence that Plaintiff

qualified as disabled under Listings 12.04 and 12.15; (3) affording partial weight to the opinions

of Penny Sprecher, Ph.D., and little weight to the opinion of Leatha Boyles, F.N.P.; and, (4)

relying at step five on the testimony of the vocational expert ("VE") that Plaintiff could perform

the work of a laundry folder — of which there exist only 10,000 positions nationally — to find

that Plaintiff could perform work existing in significant numbers in the national economy. (Pl.'s

Mem. of P. & A. in Supp. of His Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 14) at 12-22.) This

matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for

review.[2] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary

Judgment (ECF Nos. 11, 12) and Motion to Remand (ECF No. 13) be GRANTED, that

Defendant's Motion for Summary Judgment (ECF No. 15) be DENIED and that the final

decision of the Commissioner be VACATED and REMANDED pursuant to the fourth sentence

of 42 U.S.C. § 405(g).

## I.    PROCEDURAL HISTORY

On October 9, 2013, Plaintiff protectively applied for DIB, alleging disability from a

herniated lumbar disc, chronic low back pain, numbness in his leg, knee pain, depression,

anxiety and difficulty breathing, with an alleged onset date of January 2, 2010. (R. at 112.) The

SSA denied Plaintiff's claim on November 7, 2014, and again upon reconsideration on July 21,

---

[2]    The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

2015. (R. at 111, 125.) At Plaintiff's written request, the ALJ held a hearing on April 18, 2017.

(R. at 37-67, 151-52.) On November 13, 2017, the ALJ issued a written opinion, denying

Plaintiff's claim and concluding that Plaintiff did not qualify as disabled under the Act. (R. at

16-31.) On September 10, 2018, the Appeals Council denied Plaintiff's request for review,

rendering the ALJ's decision as the final decision of the Commissioner subject to review by this

Court. (R. at 1-7.)

## II.     STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the

Social Security Administration's disability determination 'when an ALJ has applied correct legal

standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v.*

*Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a

preponderance and includes the kind of relevant evidence that a reasonable mind could accept as

adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig*

*v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard

'presupposes . . . a zone of choice within which the decision makers can go either way, without

interference by the courts. An administrative decision is not subject to reversal merely because

substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F.

App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir.

1988)). To determine whether substantial evidence exists, the court must examine the record as

a whole, but may not "undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see also Biestek v. Berryhill*,

3

139 S. Ct. 1148, 1157 (2019) (holding that the substantial-evidence inquiry requires case-by-case consideration, with deference to the presiding ALJ's credibility determinations). In considering the decision of the Commissioner based on the record, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations. § 404.1545(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

4

### III. THE ALJ'S DECISION

On April 18, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel) and a VE testified. (R. at 37-67.) On November 13, 2017, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 16-31.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 19-31.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between his alleged onset date of January 2, 2010 and his date last insured of December 31, 2014. (R. at 19.) At step two, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease diagnosed as chronic lower back pain and lumbago,[3] anxiety, depression, chronic knee pain and obesity. (R. at 19.) At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work as defined in 20 C.F.R. § 404.1567(b) with additional limitations. (R. at 22.) Specifically, Plaintiff could lift and carry up to twenty pounds frequently and up to forty pounds occasionally. (R. at 22.) The ALJ also limited Plaintiff to standing or walking for up to four hours in an eight-hour workday, with the option to alternate between sitting and standing every thirty minutes. (R. at 22.) Plaintiff could occasionally kneel, crouch, crawl and climb ramps and stairs, and Plaintiff could frequently balance. (R. at 22.) The ALJ concluded that Plaintiff could never climb ladders, ropes and scaffolds. (R. at 22.) As for Plaintiff's mental limitations, the ALJ found that

---

[3] Lumbago, a nonmedical term, describes any pain in the lower back. *Lumbago*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

Plaintiff could complete only simple, routine and repetitive tasks not in a production-based setting. (R. at 22.) Furthermore, the ALJ limited Plaintiff to only occasional interaction with supervisors and co-workers and zero interaction with the public. (R. at 22.)

At step four, the ALJ determined that Plaintiff could not perform any of his past relevant work. (R. at 29.) However, at step five, the ALJ found that Plaintiff's age, education, work experience and RFC allowed him to perform jobs existing in significant numbers in the national economy, including the representative occupation of laundry folder. (R. at 29-30.) Therefore, the ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 30.)

## IV. ANALYSIS

Plaintiff, fifty-six years old at the time of this Report and Recommendation, previously worked as a diesel mechanic. (R. at 111, 287.) He applied for DIB, alleging disability from a herniated lumbar disc, chronic low back pain, numbness in his leg, knee pain, depression, anxiety and difficulty breathing, with an alleged onset date of January 2, 2010. (R. at 112.) Plaintiff appeals to this Court, contending that the ALJ erred by: (1) failing to consider Plaintiff's ADHD, PTSD and specific learning disability in determining Plaintiff's severe impairments; (2) ignoring substantial evidence that Plaintiff qualified as disabled under Listings 12.04 and 12.15; (3) affording partial weight to the opinions of Dr. Sprecher and little weight to the opinion of Nurse Boyles; and, (4) relying at step five on the testimony of the VE that Plaintiff could perform the work of a laundry folder — of which there exist only 10,000 positions nationally — to find that Plaintiff could perform work existing in significant numbers in the national economy. (Pl.'s Mem. at 12-22.) For the reasons set forth below, the ALJ erred in his decision.

**A.    Substantial Evidence Supports the ALJ's Implicit Step-Two Finding that Plaintiff's ADHD, PTSD and Specific Learning Disability Did Not Impact His Ability to Perform Work-Related Functions.**

Plaintiff first challenges the adequacy of the ALJ's RFC determination, because the ALJ did not consider all of Plaintiff's diagnoses in determining his severe impairments. (Pl.'s Mem. at 16.) Specifically, Plaintiff contends that the ALJ incompletely listed Plaintiff's severe medical impairments, because Plaintiff's ADHD, PTSD and specific learning disability also severely impaired him. (Pl.'s Mem. at 16.) Defendant responds that the record supports the ALJ's step-two conclusion. (Def.'s Mot. for Summ. J. & Br. in Support Thereof ("Def.'s Mem.") (ECF No. 15) at 25-26.)

At step two of the decisional process, the ALJ determines "the medical severity of a claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment or combination of impairments proves severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." § 404.1520(c). However, the determination of whether an impairment qualifies as severe presents merely "a threshold question with a de minimis . . . requirement." *Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987)); *see Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) ("[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims.").

Here, the ALJ found that Plaintiff suffered from five severe impairments, namely: degenerative disc disease diagnosed as chronic lower back pain and lumbago, anxiety, depression, chronic knee pain and obesity. (R. at 19.) In support of this conclusion, the ALJ relied primarily on the July 2012 opinion of ALJ Nunez, which found that Plaintiff suffered from the same severe impairments except chronic knee pain. (R. at 19.) The ALJ included chronic

knee pain as a severe impairment after considering additional evidence and the passage of time. (R. at 19-20.) Notably, at step two, the ALJ did not address whether Plaintiff suffered from ADHD, PTSD or a specific learning disability, which the Court interprets as an implicit conclusion that those impairments did not impact Plaintiff's work-related functions during the relevant period.

Indeed, the Court's own review of the record reveals only one opinion — the March 2017 opinion of Dr. Sprecher — diagnosing Plaintiff with ADHD, PTSD and a learning disability more than two years after his date last insured. (R. at 462, 469.) Plaintiff otherwise presents no evidence that the conditions in question impacted him during the relevant period. As the ALJ observed in his RFC assessment, Plaintiff received minimal treatment for his mental impairments during the relevant period. (R. at 25.) Plaintiff described briefly attending counseling, but the record lacks evidence of treatment by a mental health specialist or inpatient treatment for his mental health diagnoses. (R. at 25, 399, 465.) And, in applying for DIB, Plaintiff did not identify ADHD, PTSD or a specific learning disability as conditions that disabled him. (R. at 235.)

Ultimately, Plaintiff failed to produce evidence that the impairments in question impacted him in any way before his date last insured; therefore, the ALJ did not err at step two. *See Bird*, 699 F.3d at 341 (holding that evidence created after a claimant's date last insured may be considered retroactively when "that evidence permits an inference of linkage with" the relevant period); *Bullock v. Colvin*, 2017 WL 603298, at *3 (W.D.N.C. Feb. 14, 2017) (holding that the plaintiff's production of evidence showing the possibility of a severe impairment before and after, but not during, the relevant period did not satisfy the plaintiff's burden at step two (citing *Bowen*, 482 U.S. at 146)); *McCoy v. Colvin*, 2014 WL 221103, at *4 (W.D.N.C. Jan. 21, 2014)

(affirming the ALJ's finding that the plaintiff did not suffer from any severe mental impairments, because no evidence existed showing that the plaintiff suffered from mental impairments during the relevant period, and because the plaintiff did not identify any mental impairments in her application for DIB).

### B. Substantial Evidence Supports the ALJ's Finding That Plaintiff's Impairments Did Not Meet or Medically Equal the Criteria of Listings 12.04 and 12.15.

Plaintiff challenges the ALJ's step-three determination that his impairments did not meet or medically equal the severity of the listed impairments in Listings 12.04 (depressive, bipolar and related disorders) and 12.15 (trauma and stressor-related disorders). (Pl.'s Mem. at 12-15.) Specifically, Plaintiff contends that substantial evidence supports a finding that he met the criteria of both listings. (Pl.'s Mem. at 12-15.) Defendant responds that substantial evidence supports the ALJ's step-three conclusions. (Def.'s Mem. at 18-23.) Because "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision," *Clarke*, 843 F.2d at 272-73, this Court will consider only whether substantial evidence supports the ALJ's step-three conclusions.

At step three, Plaintiff bears the burden of proving that he meets or equals a listing. *Yuckert*, 482 U.S. at 146 n.5. The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530.

Plaintiff's condition must satisfy all of the enumerated criteria in Listings 12.04 or 12.15

to qualify him as disabled at step three. *Id.* at 530. Specifically, to meet the requirements of

Paragraph A of Listing 12.04, Plaintiff must first provide medical documentation of either:

> 1. Depressive disorder, characterized by five or more of the following: a. Depressed mood; b. Diminished interest in almost all activities; c. Appetite disturbance with change in weight; d. Sleep disturbance; e. Observable psychomotor agitation or retardation; f. Decreased energy; g. Feelings of guilt or worthlessness; h. Difficulty concentrating or thinking; or, i. Thoughts of death or suicide. [OR]

> 2. Bipolar disorder, characterized by three or more of the following: a. Pressured speech; b. Flight of ideas; c. Inflated self-esteem; d. Decreased need for sleep; e. Distractibility; f. Involvement in activities that have a high probability of painful consequences that are not recognized; or, g. Increase in goal-directed activity or psychomotor agitation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04. For Paragraph A of Listing 12.15, Plaintiff must

provide medical documentation of all of the following:

> 1. Exposure to actual or threatened death, serious injury, or violence; 2. Subsequent involuntary re-experiencing of the traumatic event (for example, intrusive memories, dreams, or flashbacks); 3. Avoidance of external reminders of the event; 4. Disturbance in mood and behavior; and 5. Increases in arousal and reactivity (for example, exaggerated startle response, sleep disturbance).

*Id.* at 12.15.

Upon presenting sufficient medical documentation of any of the disorders in either

Listing 12.04 or 12.15, Plaintiff must then present documentation showing either:

> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):[4] 1. Understand, remember, or apply information (see 12:00E1). 2. Interact with others (see 12.00E2). 3. Concentrate, persist, or maintain pace (see 12.00E3). 4. Adapt or manage oneself (see 12.00E4). [OR]

---

[4]     The regulations define "extreme limitation" to mean "[the claimant is] not able to function in this area independently, appropriately, effectively, and on a sustained basis." "Marked limitation," on the other hand, means that "[the claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00F2.

C. The mental disorder in this listing category is "serious and persistent;" that is, a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder (see 12.00G2b); and, 2. Marginal adjustment, that is, a minimal capacity to adapt to changes in the environment or to demands that are not already part of their daily life (see 12.00G2c).

*Id.* at 12.04, 12.15.

Here, the ALJ determined that Plaintiff's mental impairments, both singly and combination, did not meet or medically equal the criteria of Listing 12.04. (R. at 20.) Considering first whether Plaintiff's impairments satisfied Paragraph B of Listing 12.04, the ALJ determined that Plaintiff had only moderate limitations in understanding, remembering or applying information. (R. at 20.) The ALJ recognized Plaintiff's complaints of poor short-term memory, a short attention span and difficulty staying focused; however, the ALJ noted that Plaintiff could take care of his personal needs, prepare meals, load the dishwasher, drive short distances, make monthly trips to the store for breakfast and lunch, pay bills, count change, use a checkbook/money order, watch television, attend medical appointments and receive daily visits from his sister. (R. at 20.)

The ALJ likewise found only moderate limitations in Plaintiff's ability to interact with others. (R. at 20.) The ALJ acknowledged that Plaintiff and his sister both described Plaintiff's anger issues and occasional incidents of lashing out at other people. (R. at 20-21.) The ALJ also noted that Plaintiff testified to becoming more withdrawn and isolated. (R. at 21.) But the ALJ again observed that Plaintiff retained "at least some capacity to drive, maintain medical appointments, talk to friends on the phone, and receive daily visits from his sister." (R. at 21.)

11

And the ALJ cited to Plaintiff's statements that he could get along with authority figures and had never lost employment due to problems getting along with others. (R. at 21.)

As to Plaintiff's ability to maintain concentration, persistence and pace, the ALJ again found only moderate limitations. (R. at 21.) The ALJ noted Plaintiff's complaints of difficulty with his short-term memory, completing task, concentrating, handling stress and understanding and following instructions. (R. at 21.) However, the ALJ found that Plaintiff's capacity to watch television, drive, load the dishwasher, pay bills, count change, use checkbooks or money orders and maintain medical appointments discredited his complaints. (R. at 21.)

As to Plaintiff's ability to adapt and manage himself, the ALJ found that Plaintiff experienced only mild limitations. (R. at 21.) The ALJ considered Plaintiff's testimony about getting only two to four hours of sleep per night and taking two to three hours of naps during normal working hours, but again noted that Plaintiff could take care of his personal needs, prepare meals, load the dishwasher, check the mail, drive, pay bills, count change, use a checkbook or money order, watch television, talk on the phone and maintain medical appointments. (R. at 21.)

Because Plaintiff failed to establish that he suffered at least one extreme limitation or two marked limitations in the required areas of functioning, the ALJ concluded that Plaintiff did not satisfy Paragraph B under Listing 12.04. (R. at 21.) The ALJ found that Plaintiff likewise failed to establish that he met the Paragraph C criteria of Listing 12.04. (R. at 21.) Specifically, the ALJ found "no evidence of a 'serious and persistent' mental disorder, existing for a period of at least two years, and accompanied by both: (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the mental disorder;" and, (2) "marginal adjustment, that is, a minimal

capacity to adapt to changes in [his] environment or to demands not already part of [his] daily life." (R. at 21.) With neither Paragraph B nor Paragraph C of Listing 12.04 satisfied, the ALJ concluded that Plaintiff's mental impairments did not meet or medically equal the criteria of that Listing. (R. at 21.)

Regarding Listing 12.15, the ALJ made no findings, which the Court interprets as an implicit conclusion that Plaintiff failed to present medical documentation that he experienced the symptoms described in Paragraph A of that Listing. Moreover, Paragraphs B and C under Listing 12.04 apply also to Listing 12.15, so the ALJ's finding that Plaintiff did not satisfy Paragraph B or Paragraph C with regard to Listing 12.04 equally disqualifies Plaintiff from claiming that he is disabled under Listing 12.15. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04, 12.15. The Court finds that the ALJ adequately explained why Plaintiff did not satisfy the criteria of Listing 12.04 and, by implication, Listing 12.15. Moreover, substantial evidence supports the ALJ's conclusions as to both Listings.

## 1. *Plaintiff's Objective Medical Records Support the ALJ's Step-Three Conclusions.*

Although the ALJ relied primarily on Plaintiff's own statements regarding his activities of daily living to find that Plaintiff did not satisfy Listing 12.04, the ALJ explained that "no evidence" established that Plaintiff satisfied Paragraph C of the Listing, which includes the objective medical evidence. (R. at 21.) Indeed, a review of Plaintiff's medical records reveals little to no evidence that Plaintiff had a mental disorder lasting at least two years with evidence of both (1) ongoing medical treatment, mental health therapy, psychosocial support or a highly structured setting that diminished the symptoms and signs of the disorder and (2) Plaintiff's

13

"minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life" despite treatment.[5] 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04, 12.15.

For one, Plaintiff's minimal mental health treatment records reveal that he demonstrated normal memory, (R. at 362), and an organized thought process, (R. at 401, 466). Plaintiff also retained reality-based thought content, with no signs of hallucinations or delusions. (R. at 401, 466.) Plaintiff's physicians and psychiatrists described him as cooperative, (R. at 313, 466), with appropriate eye contact, (R. at 401). Moreover, Plaintiff frequently exhibited a normal attention span. (R. at 431, 436, 443, 452, 456.) Plaintiff also appeared alert and oriented during nearly every appointment on record. (R. at 313, 331, 333, 344, 349, 364, 366, 368, 406, 431, 436, 443, 452, 456, 475.) And Plaintiff frequently appeared well-nourished and well-developed. (R. at 331, 337, 341, 349, 353, 355, 357, 384, 407, 410.)

Overall, the record fails to provide any evidence of a "serious and persistent" mental disorder which satisfies Paragraph C and prevents Plaintiff from adjusting more than marginally to external stressors. And the medical records further bolster the ALJ's findings as to the Paragraph B criteria, demonstrating that Plaintiff retained at least some capacity to understand,

---

[5]     The regulations explain that Paragraph C2 of Listings 12.04 and 12.15 requires evidence that a claimant continues to achieve only marginal adjustment despite his or her diminished symptoms or signs from the treatment(s) in Paragraph C1. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00G2c. The regulations direct that the Commissioner will consider that a claimant has achieved only marginal adjustment "when the evidence shows that changes or increased demands have led to exacerbation of [the claimant's] symptoms and signs and to deterioration of [the claimant's] functioning." *Id.* By way of example, the regulations explain that a claimant may satisfy Paragraph C2 with evidence that (a) the claimant cannot function outside of their home or a more restrictive space without substantial psychosocial supports, (b) the claimant's functional deterioration due to changes or increased demands required changes to medications or other treatments, or (c) the claimant's episodes of functional deterioration required hospitalization or work absences that made it difficult to sustain work activity. *Id.*

remember and apply information, interact with others, maintain concentration, persistence and pace, and adapt and manage himself.

### 2. *Plaintiff's Own Statements Support the ALJ's Step-Three Conclusions.*

The ALJ relied primarily on Plaintiff's own statements in reaching his step-three conclusions. Specifically, when addressing Plaintiff's ability to understand, remember, or apply information, the ALJ noted Plaintiff's allegations that he suffered from poor short-term memory and a short attention span. (R. at 20, 262.) However, the ALJ correctly noted that those allegations proved internally inconsistent with Plaintiff's statements that he "retain[ed] at least some capacity to take care of his personal needs, prepare meals, load the dishwasher, drive short distances, make monthly trips to the local country store for breakfast/lunch, pay bills, count change, use a checkbook/money order, watch television, attend medical appointments, and receive visits from his sister on a daily basis." (R. at 20, 244-51, 256-59.)

As to Plaintiff's ability to interact with others, the ALJ acknowledged Plaintiff's statements about having an anger issue, sometimes lashing out at other people including his sister and doctors and becoming more withdrawn and isolated at home. (R. at 20-21.) But the ALJ again noted that Plaintiff's alleged limitations proved internally inconsistent with his self-reported ability "to drive, maintain medical appointments, talk to friends on the phone . . . [and] receive daily visits from his sister" — an observation that the record supports. (R. at 21, 244-51, 256-59, 261.) And, as the ALJ aptly noted, Plaintiff "did not note any problems getting along with authority figures and noted that he had never been laid off from employment due to problems getting along with other people." (R. at 21, 244-51, 256-59, 261.)

In considering Plaintiff's ability to maintain concentration, persistence and pace, the ALJ referred to Plaintiff's 2014 Function Report, in which Plaintiff complained of problems with his

short-term memory, completing tasks, concentrating, handling stress, and understanding and following instructions. (R. at 21, 260.) Nonetheless, as the ALJ noted, Plaintiff testified to retaining "at least some capacity to watch television, drive, load the dishwasher, pay bills, count change, use checkbooks or money orders, and maintain medical appointments," which undermined his subjective complaints. (R. at 21, 256-59.)

Plaintiff's testimony further substantiates the ALJ's finding that Plaintiff experienced only mild limitations in adapting and managing himself. (R. at 21.) The ALJ noted that Plaintiff testified to sleeping only two to four hours per night, causing him to feel tired during the day and requiring him to take two to three hours of naps during working hours. (R. at 21.) However, the ALJ correctly observed inconsistencies between Plaintiff's complaints and his own function report. Indeed, as the ALJ noted, Plaintiff reported that he "retain[ed] at least some capacity to take care of his personal needs, prepare meals, load the dishwasher, check the mail, drive, pay bills, count change, use a checkbook/money order, watch television, talk on the phone, and go to medical appointments." (R. at 21, 256-59.)

Ultimately, the ALJ adequately addressed contradictions between Plaintiff's testimony and the other evidence of record, giving Plaintiff's testimony credit when it appeared consistent with the objective medical evidence and his own statements.

### 3. The 2012 Opinion of ALJ Nunez, on Which the ALJ Relied at Step Three, Further Supports the ALJ's Step-Three Conclusions.

In support of his step-three findings, the ALJ also considered the June 2012 opinion of ALJ Maria Nunez regarding Plaintiff's May 2010 application for Supplemental Security Income. (R. at 22.) When a claimant files an application for disability benefits after a previous denial of benefits, *res judicata* does not apply unless the claimant files an identical claim. *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 476 (4th Cir. 1999). However, an ALJ must consider the

16

findings made in a prior decision by an ALJ or the Appeals Council, assigning those findings "appropriate weight in light of all relevant facts and circumstances." AR 00-1(4), 2000 WL 43744, at *4. In determining the appropriate weight to assign, the ALJ considers such factors as: (1) the prior finding's susceptibility to change with the passage of time; (2) the likelihood of such a change; and, (3) the extent that evidence not considered in the prior decision provides a basis for making a different finding in the subsequent claim. *Id.* Prior findings about facts such as a claimant's RFC or the severity of an impairment generally deserve less weight as the timeframe between claims increases. *Id.* In reviewing the weight assigned to a prior ALJ finding, the Court applies the substantial evidence test. *See Albright*, 174 F.3d at 477-78 (applying the substantial evidence rule rather than preclusion principles to a prior ALJ's decision).

In her 2012 opinion, ALJ Nunez found that Plaintiff's impairments did not meet the requirements of any of the listed impairments. (R. at 22, 96-97.) Considering the passage of time, the likelihood that Plaintiff's conditions changed since ALJ Nunez's opinion and the new evidence of record, the ALJ afforded ALJ Nunez's step-three conclusions significant weight. (R. at 22.) As documented above, the medical record continues to support Judge Nunez's finding. Accordingly, the ALJ properly explained the weight afforded to Judge Nunez's opinion and substantial evidence supports the weight assigned, further bolstering the ALJ's step-three conclusions.

### 4. *The Opinions of Dr. Sprecher on Which Plaintiff Relies Fails to Rescue His Step-Three Challenge.*

The opinions of Dr. Sprecher on which Plaintiff relies fail to rescue his step-three challenge. Specifically, Plaintiff argues that his impairments satisfy the Paragraph B criteria, because he had extreme limitations in all four areas of functioning, again relying on Dr.

Sprecher's opinions from 2014 and 2017 to support his argument. (Pl.'s Mem. at 13.) The Court disagrees.

In October 2014, Dr. Sprecher opined that Plaintiff "may find it difficult to complete a normal workweek due to his mood swings . . . . his mood would also interfere with his ability to get along with others on the job . . . . [and he] is likely to work slower than same-age peers." (R. at 402.) In April 2017, Dr. Sprecher reached similar conclusions, noting that Plaintiff "is prone to making mistakes on the job due to his inability to sustain attention . . . . [and] may have difficulty carrying out simple instructions," requiring additional supervision on the job. (R. at 470.) However, as explained below, the ALJ appropriately afforded only partial weight to Dr. Sprecher's opinions, because they proved inconsistent with the record. (R. at 27.) Moreover, "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Dunn*, 607 F. App'x at 274 (quotations and citations omitted). Because substantial evidence supports the ALJ's step-three findings, even if Dr. Sprecher's opinions support the opposite conclusion, the Court will not remand.

### 5. *The ALJ Did Not Err by Failing to Make Findings Regarding Listing 12.15.*

Finally, the ALJ did not err by failing to make findings regarding Listing 12.15. The Court interprets the absence of any Listing 12.15 findings as an implicit conclusion that Plaintiff failed to present medical documentation that he experienced the symptoms described in Paragraph A of that Listing. Plaintiff argues that he satisfied the Listing 12.15 criteria, because a relative violently molested him as a child, he experiences involuntary flashbacks of the event and it disturbs his mood and behavior. (Pl.'s Mem. at 14.) In support of his argument, Plaintiff cites to his testimony concerning his traumatic childhood and to a June 17, 2015 appointment during which Nurse Boyles documented his molestation. (Pl.'s Mem. at 14; R. at 44, 48, 406.) Plaintiff

further relies on Dr. Sprecher's April 2017 opinion, in which she diagnosed Plaintiff with PTSD. (Pl.'s Mem. at 14; R. at 469.)

However, Dr. Sprecher's opinion constitutes the only documentation of a PTSD diagnosis in the record, and it occurred two years after the relevant period. Moreover, as explained below, the ALJ properly afforded only partial weight to Dr. Sprecher's opinion and little weight to Nurse Boyles's opinion. (R. at 27-28.) Therefore, the ALJ appropriately discounted the only medical documentation suggesting that Plaintiff satisfied the criteria of Paragraph A.

Moreover, as mentioned, Paragraphs B and C under Listing 12.04 apply also to Listing 12.15. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04, 12.15. Consequently, the ALJ's finding that Plaintiff's impairments did not satisfy Paragraph B or Paragraph C under Listing 12.04 equally precludes Plaintiff from claiming that he qualifies as disabled under Listing 12.15. *Id.* Because substantial evidence supports the ALJ's assessment of Listing 12.04, such an assessment precludes a finding of disability under Listing 12.15.

### C.     The ALJ Did Not Err in Affording Only Partial Weight to the Opinions of Dr. Sprecher and Little Weight to the Opinion of Nurse Boyles.

Plaintiff argues that the ALJ erred by affording only partial weight to the examining opinions of Dr. Sprecher and little weight to the treating opinion of Nurse Boyles. (Pl.'s Mem. at 16-20.) Specifically, regarding Dr. Sprecher's opinions, Plaintiff argues that substantial evidence does not support the ALJ's finding that Plaintiff "retain[ed] the ability to drive, run errands, talk to friends on the telephone, maintain medical appointments, and receive daily visits from his sister" despite his long history of depression and anxiety. (Pl.'s Mem. at 16-17.) Similarly, Plaintiff argues that substantial evidence does not support the ALJ's assignment of little weight to Nurse Boyles's opinion. (Pl.'s Mem. at 19-20.) Defendant responds that the ALJ

properly explained the weight assigned to both opinions and that substantial evidence supports the ALJ's findings. (Def.'s Mem. at 21, 26-27.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. § 404.1527(c). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. § 404.1527(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-3p.[6] Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a). The regulations

---

[6]    Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. § 404.1527(f). 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed his claim on October 9, 2013, before this regulation took effect. (R. at 112.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. SSR 06-03p; § 404.1527(f).[7] Under the applicable regulations and caselaw, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. § 404.1527(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistencies.'" *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. § 404.1527(c). However, those same

---

[7]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. § 404.1527(f). The given examples are a non-exhaustive list. SSR 06-03p.

regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. § 404.1527(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

### 1. The ALJ Properly Explained the Weight Afforded to Dr. Sprecher's Opinions and Substantial Evidence Supports the Weight Assigned.

On October 7, 2014, Dr. Sprecher performed a mental status examination of Plaintiff on behalf of the City of Richmond's Disability Determination Services. (R. at 398-403.) Dr. Sprecher reviewed Plaintiff's medical records and examined Plaintiff in person. (R. at 398.) Although Plaintiff's sister drove him to the examination, Plaintiff reported that he could drive but avoided driving more than fifteen to twenty minutes from his home. (R. at 398.) Plaintiff reported that he had one prior marriage that ended in 2001 after five months. (R. at 398.) Plaintiff explained that he lived alone at the time of the examination. (R. at 398.)

In reciting his symptoms and conditions, Plaintiff again complained of herniated discs and back pain with associated leg numbness. (R. at 398.) Plaintiff also mentioned that his physicians found nodules in his lungs that caused his shortness of breath. (R. at 393, 398.) And Plaintiff complained of swollen feet. (R. at 398.) As to his mental impairments, Plaintiff described a long history of depression and reported experiencing suicidal thoughts since the age of eleven or twelve. (R. at 399.) Plaintiff confirmed a history of ongoing suicidal ideation and generally having a suicide plan, stating that he "always [had] a way," though he later denied having a suicide plan. (R. at 399, 401.) Plaintiff explained that he lacked motivation and felt like either crying or raging, adding that he isolated himself and felt significant fatigue. (R. at 399.) Plaintiff attributed his anxious and panicked mood to his work, though he later stated that his anxiety and depression became more severe after he stopped working. (R. at 399.) Plaintiff

22

admitted that his depression and anxiety caused him to neglect his physical health, making his condition worse. (R. at 399.) And Plaintiff denied auditory or visual hallucinations. (R. at 399.)

As far as treatment, Plaintiff reported that he received treatment from Nurse Boyles for his physical ailments and took Xanax for his depression and another medication for his anxiety. (R. at 399.) Plaintiff described participating in counseling in 2012, which he discontinued after only three therapy sessions, because his therapist angered him. (R. at 399.)

In recalling his past, Plaintiff described surviving several episodes of sexual abuse during his childhood, which led him to self-medicate with alcohol. (R. at 399.) Plaintiff also relayed a history of illicit drug use, including using marijuana and methamphetamine, though he denied drug use within the past ten years. (R. at 399-400.) Plaintiff described feeling tempted to overuse his Percocet prescription, though he affirmed that he had resisted such temptation. (R. at 400.) Plaintiff noted frequent truancy while in school and stated that he dropped out of high school in tenth grade. (R. at 400.) From 1993 until 2010, Plaintiff worked for International Trucking, where he injured his back while on the job. (R. at 400.) Plaintiff recalled having a confrontation with his boss after the boss overworked him following his back injury. (R. at 400.)

Socially, Plaintiff reported that he had lost several friends due to his history of alcohol and drug abuse. (R. at 400.) Plaintiff further denied having friends in his neighborhood; however, his sister lived a quarter mile from him. (R. at 400.) During a typical day, Plaintiff stated that he watched television. (R. at 400.) Plaintiff complained that he had difficulty sleeping, receiving only two hours of uninterrupted sleep on an average night and requiring naps during the day. (R. at 400.) Plaintiff ate little due to poor appetite from his gallbladder problems. (R. at 400.)

In evaluating Plaintiff, Dr. Sprecher observed a "dull look" on Plaintiff's face. (R. at 400.) Dr. Sprecher noted that Plaintiff became tearful while describing the loss of his brother at age nine. (R. at 400.) And Plaintiff sat with an uncomfortable, erect posture. (R. at 400-01.) However, Plaintiff maintained normal eye contact and appeared "more talkative than one would have expected given his physical complaints." (R. at 401.) Plaintiff moved slowly, with a "sluggish" gait and "unremarkable" psychomotor excitement. (R. at 401.) Plaintiff spoke clearly and articulately, though he exhibited "flat" and "empty" affect. (R. at 401.) Dr. Sprecher opined that Plaintiff generally had a tearful mood. (R. at 401.) Mentally, Plaintiff exhibited "adequate" thought organization and "reality-based" thought content, denying delusions and hallucinations. (R. at 401.)

Based on her evaluation, Dr. Sprecher diagnosed Plaintiff with panic disorder without agoraphobia and major, recurrent depression without psychotic symptoms. (R. at 401.) Dr. Sprecher attributed Plaintiff's mental disorders to his poor sleep, poor appetite and crying spells. (R. at 401.) Dr. Sprecher also noted symptoms of low motivation and a history of ongoing suicidal ideation, though Plaintiff denied any ideation or having suicide plan at the time of the examination. (R. at 401.) And Dr. Sprecher repeated Plaintiff's reports of panic attacks, which occurred at least one or two times a week. (R. at 401.) Dr. Sprecher found Plaintiff to be reliable, citing to his consistent reporting and obvious discomfort. (R. at 401-02.)

Functionally, Dr. Sprecher noted Plaintiff's difficulty reading and writing but stated that Plaintiff could manage his money in his own best interest. (R. at 401.) Dr. Sprecher opined that Plaintiff could understand and carry out simple instructions and found that Plaintiff could drive only short distances due to his pain. (R. at 402.) Dr. Sprecher believed that Plaintiff likely would present as moody or irritable in the workplace, citing to Plaintiff's reports of lashing out

24

against his sister. (R. at 402.) Due to his irritability and likelihood of being both mentally and verbally abusive toward co-workers and the public, Dr. Sprecher limited Plaintiff to workplaces with only a few other employees and one boss. (R. at 402.) Dr. Sprecher further opined that Plaintiff would find it difficult to complete a normal workweek due to his mood swings. (R. at 402.) And Dr. Sprecher noted that Plaintiff likely would work slower than same-age peers, citing to his long response time in answering questions and difficulty with mobility. (R. at 402.)

On March 31, 2017, Dr. Sprecher conducted a medical capacity assessment of Plaintiff. (R. at 460-62.) Dr. Sprecher opined that Plaintiff had marked limitations in his ability to carry out very short and simple instructions. (R. at 460.) Dr. Sprecher also found that Plaintiff exhibited extreme limitations in his ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday or workweek without interruptions from psychologically based symptoms; and, perform at a consistent pace with a one-hour lunch break and two fifteen-minute rest periods. (R. at 460.) Dr. Sprecher estimated that Plaintiff likely would have over four absences from work in an average month. (R. at 460.)

As to Plaintiff's social abilities, Dr. Sprecher opined that Plaintiff had marked limitations in his ability to ask simple questions or request assistance, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 461.) And Dr. Sprecher reported that Plaintiff had extreme limitations in his ability to: interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and,

get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 461.)

Dr. Sprecher opined that Plaintiff had marked limitations in his ability to be aware of normal hazards and take appropriate precautions. (R. at 461.) Dr. Sprecher further opined that Plaintiff exhibited extreme limitations in his ability to: respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; set realistic goals or make plans independently of others. (R. at 461.) Dr. Sprecher noted that Plaintiff had a history of substance abuse, but found that such history did not negatively impact her assessment. (R. at 461.) And Dr. Sprecher described Plaintiff as credible and not feigning his impairments to escape work. (R. at 461.)

On April 3, 2017, Dr. Sprecher issued a psychological evaluation based on her examinations of Plaintiff on January 24, 2017, February 22, 2017 and March 15, 2017, a review of Plaintiff's medical records and her March 31, 2017 mental capacity assessment. (R. at 463.) Plaintiff's sister accompanied him to the evaluation, during which Plaintiff presented with chronic back pain resulting from slipping on ice at work. (R. at 463.) Plaintiff also relayed his significant history of depression. (R. at 463.) Plaintiff described his depression going back to age ten, when a cousin sexually molested him. (R. at 463.) Subsequently, as an adolescent, Plaintiff witnessed his mother's mental health issues, including her attempted suicide. (R. at 463.) Plaintiff continued to experience flashbacks to his abuse and had difficulty falling and staying asleep. (R. at 463.) Plaintiff attributed his mental health issues and feelings of helplessness to his history of trauma. (R. at 463.)

In describing his symptoms, Plaintiff alleged that he had several herniated discs, which limited his ability to stand for even a short period of time. (R. at 464.) Plaintiff explained that

he constantly experienced discomfort and his pain reached a nine or ten out of ten on some days. (R. at 464.) Plaintiff's pain limited his ability to cook and perform simple tasks, restricting his diet to microwavable foods. (R. at 464.) Additionally, Plaintiff described problems with both of his knees, his legs going numb and difficulty catching his breath. (R. at 464.)

In elaborating on his history, Plaintiff explained that his depression dated back to childhood, during which he experienced suicidal thoughts and had a suicide plan as early as age twelve. (R. at 464.) Plaintiff also described his difficulty with motivation and significant mood swings, including anger and crying spells, which caused him to isolate himself in his home for up to two weeks and neglect his personal hygiene. (R. at 464.) Dr. Sprecher opined that Plaintiff likely used isolation as a coping mechanism for his anxiety and that his symptoms suggested a likely panic disorder. (R. at 464.) She further reported that although Plaintiff lived alone, his sister lived nearby and provided significant support to him. (R. at 464.)

Regarding Plaintiff's treatment, Dr. Sprecher reported that Plaintiff had a new physician, Daniel Breznaom, M.D., and emphasized that Plaintiff could not remember the new doctor's name until later in the interview. (R. at 464.) Plaintiff continued to receive treatment for his pain, hypertension, shortness of breath and sensitive eyes, though he could not find medications that provided significant relief. (R. at 464.) His prescriptions then included hydrochlorothiazide, Xanax, escitalopram and metoprolol. (R. at 464.) Dr. Sprecher also noted that Plaintiff's history of pain management treatment included cortisone injections sporadically between 2008 and 2016, which failed to provide relief. (R. at 465.) Further, Plaintiff had tried physical therapy and various specialists but had been unable to continue specialized treatment, because of his limited health insurance. (R. at 465.) Plaintiff also ended counseling in 2012 after about two sessions, explaining that although he shared more with the counselor about his history of sexual abuse

than he had ever disclosed with anyone, the counselor could not help him and he did not return. (R. at 465.) Dr. Sprecher recorded that Plaintiff had a history of self-medication but had been clean in the last fifteen years. (R. at 465.)

Functionally, Plaintiff described trouble learning in school due to difficulty reading and writing. (R. at 465.) Plaintiff reported that he had dropped out after tenth grade. (R. at 465.) Plaintiff reported writing numbers and letters backwards into high school. (R. at 465.) Indeed, Dr. Sprecher administered a standardized psychometric test of adult personality and psychopathology during the examination and could not score it, because Plaintiff skipped several questions likely due to his reading problems. (R. at 465.) However, Plaintiff maintained employment as a diesel mechanic from 1993 to 2010. (R. at 465.) After experiencing an injury on the job, Plaintiff complained that his employer continued to push him to work beyond his physical limitations. (R. at 465.) Before working as a mechanic, Plaintiff reported working as a manual laborer on a farm. (R. at 465.)

On mental evaluation, Dr. Sprecher described Plaintiff as cooperative despite giving an impression of discomfort while guarding against pain. (R. at 466.) Plaintiff sometimes looked puzzled and sat with a slouched posture. (R. at 466.) Plaintiff walked with a slow and stiff gait and had recently fallen and broken his ribs after losing his balance on ice. (R. at 466.) Plaintiff spoke clearly although slowly and with a flat affect. (R. at 466.) Plaintiff presented a positive mood relative to his depression in spite of daily crying spells and outbursts of anger. (R. at 466.) Dr. Sprecher observed that Plaintiff exhibited an organized thought process and reality-based thought content. (R. at 466.) Plaintiff had present suicidal thoughts without a plan, reporting "I just want to die." (R. at 466.) Plaintiff demonstrated general awareness of person, place, time and self, adequate memory, ability to think in abstract terms and an average fund of general

knowledge. (R. at 466.) However, Plaintiff experienced significant difficulty focusing and impulsive judgment and reasoning ability. (R. at 466.) For example, when asked what he would do if he first saw smoke in a movie theater, he responded, "I'd sit and watch it burn." (R. at 466-67.) Additionally, Plaintiff demonstrated a lack of self-confidence and volatility in relating to others. (R. at 467.)

Dr. Sprecher conducted an intelligence quotient ("IQ") test and found Plaintiff in the seventh percentile for the general population, with a score of 78. (R. at 468.) She opined that due to a weakness in the area of working memory, Plaintiff required significantly more time to complete tasks than same-age peers. (R. at 468.) In concentration and attention screening, Plaintiff demonstrated impulsiveness and significant deficits in focusing. (R. at 468.) Plaintiff scored in the first percentile on vigilance and second percentile on distractibility, in line with a diagnosis of ADHD. (R. at 468.) On an ADHD screening, Plaintiff demonstrated difficulty paying close attention to details and made careless mistakes. (R. at 468.) Dr. Sprecher noted that Plaintiff's limitations would result in difficulty listening, finishing tasks and organizing time and space. (R. at 468.) Further, the screening suggested that Plaintiff became easily overwhelmed, indicating increased limbic involvement in the brain. (R. at 468.) Dr. Sprecher connected Plaintiff's increased brain activity to his symptoms of moodiness, negativity, irritability, low energy, loss of interest in generally fun activities, dissatisfaction and boredom. (R. at 468.)

Dr. Sprecher could not score Plaintiff on an objective personality test due to invalid responses connected to his reading comprehension. (R. at 469.) However, on the projective

Rorschach test,[8] Plaintiff demonstrated limited coping skills, confirming the presence of a mood disorder and putting him at risk of expressing his feelings in impulsive and inappropriate ways. (R. at 469.)

Based on her evaluation, Dr. Sprecher diagnosed Plaintiff with recurrent major depression, ADHD, specific learning disability, PTSD and a history of polysubstance abuse in remission. (R. at 469.) Dr. Sprecher attributed Plaintiff's depression to the trauma that he experienced early in life. (R. at 469.) Dr. Sprecher opined that Plaintiff's learning disability contributed to his difficulty with decision-making, irritability and negative demeanor, as well as his constant feelings of being overwhelmed. (R. at 469.) Dr. Sprecher opined that these issues combined with Plaintiff's ADHD to render him prone to making mistakes, requiring heightened supervision. (R. at 470.) And Dr. Sprecher noted that Plaintiff would have significant difficulty relating to co-workers, exacerbated by his depression and history of trauma. (R. at 470.)

The ALJ assigned Dr. Sprecher's opinions partial weight, explaining that the evidence of record and Plaintiff's "somewhat consistent" testimony did not support the social, concentration and memory limitations that Dr. Sprecher endorsed. (R. at 27.) Specifically, the ALJ acknowledged Plaintiff's long history of anxiety and depression, "with some complaints of memory and concentration impairment," but found that Plaintiff's reported daily activities demonstrated greater social and mental abilities than Dr. Sprecher endorsed. (R. at 27.)

The Court finds the ALJ's explanation legally sufficient, because although the ALJ's explanation appears to describe only the types of daily activities that Plaintiff could perform and not the extent to which he could perform them, which the Fourth Circuit has explicitly

---

[8]     The Rorschach test is a projective test in which the subject is asked to relate his associations to a series of inkblot designs. *Rorschach Test*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

disavowed, *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), the ALJ's brief recitation of the general activities that Plaintiff could perform follows a narrative explanation of those activities, including the extent to which Plaintiff could perform them, earlier in the ALJ's RFC assessment, (R. at 22). As this Court has previously held, "[t]he ALJ need not repeat herself by regurgitating Plaintiff's treatment record and testimony each time that she considers an opinion." *Ross v. Berryhill*, 2019 WL 289101, at *6 (E.D. Va. Jan. 3, 2019) (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)), *report and recommendation adopted*, 2019 WL 281191 (E.D. Va. Jan. 22, 2019). Therefore, the ALJ's reliance on Plaintiff's activities of daily living to discredit Dr. Sprecher's opinions proves legally sufficient, for the ALJ demonstrated that she not only considered the types of activities that Plaintiff could perform but also the extent to which he could perform them. Moreover, substantial evidence supports the weight assigned.

Indeed, throughout the record going back to 2009, Plaintiff nearly always exhibited normal functioning in his mental status exams, appearing both "alert" and "oriented." (R. at 313, 331, 334, 344, 349, 364, 366, 368, 406, 431, 436, 443, 452, 456, 475.) Plaintiff also exhibited a normal attention span and ability to concentrate, (R. at 431, 436, 443-44, 452, 456), normal memory, (R. at 362), and a stable mood, (R. at 331, 334, 338, 342, 349, 353, 356, 362, 364, 366, 369, 384, 408, 409, 475). And Plaintiff denied experiencing any mood swings since starting Wellbutrin. (R. at 336.)

Moreover, as the ALJ noted, Plaintiff's own statements further undermine Dr. Sprecher's opinions. (R. at 27.) On April 4, 2014, Plaintiff's sister completed a third-party function report on behalf of Plaintiff. (R. at 242-52.) As the ALJ noted, the sister's report documented that Plaintiff retained the ability to watch television, load the dishwasher, drive, run errands, pay

bills, count change, use a checkbook or money order, receive daily visits from his sister, talk on the phone daily and maintain medical appointments. (R. at 27, 243, 246-48.)

Additionally, on April 17, 2014, Plaintiff completed a function report that partially contradicted Dr. Sprecher's opinions. (R. at 255-62.) Again, as the ALJ correctly noted, Plaintiff reported that he retained the ability to watch television, load the dishwasher, drive, pay bills, count change, use a checkbook or money order and talk to friends on the telephone. (R. at 27, 255, 257-59.) Because the ALJ properly explained the weight afforded to Dr. Sprecher's opinion, and because substantial evidence supports the ALJ's assignment of weight, the ALJ did not err.

### 2. The ALJ Properly Explained the Weight Afforded to Nurse Boyles's Opinion and Substantial Evidence Supports the Weight Assigned.

On November 4, 2014, Nurse Boyles completed a "Continuing Disability Claim Form" on Plaintiff's behalf. (R. at 404.) Nurse Boyles concluded that Plaintiff qualified as permanently disabled since May 2008. (R. at 404.) Nurse Boyles reported that she still treated Plaintiff and had an appointment with him later that day. (R. at 404.) Nurse Boyles listed herniated lumbar disc with radiculopathy, degenerative disc disease and chronic low back pain as Plaintiff's primary impairments, which she intended to treat with medication and back exercises. (R. at 404.) Nurse Boyles opined that Plaintiff's impairments did not merely partially disable him and thus a rehabilitation program would be ineffective. (R. at 404.) Nurse Boyles found that Plaintiff's physical impairments severely limited his functional activity and rendered him incapable of even minimal, sedentary activity, including the ability to bend, squat, lift, sit or walk for any period of time. (R. at 404.)

The ALJ assigned Nurse Boyles's opinion little weight, because it proved inconsistent with the evidence in the record and Plaintiff's testimony. (R. at 28.) Specifically, the ALJ noted

32

that Plaintiff worked as a diesel mechanic through January 2010, nearly two years beyond the date of total disability that Nurse Boyles endorsed. (R. at 28, 404.) The ALJ further observed that Plaintiff generally exhibited only mild symptoms managed with conservative treatment and demonstrated a full range of motion, full muscle strength and a stable gait. (R. at 28.) Lastly, the ALJ noted that Plaintiff retained some ability to walk, sit and lift, citing to Plaintiff's testimony that he could walk to and from his mailbox, drive, run errands, prepare his own meals, and sit in his recliner. (R. at 28.) The Court finds the ALJ's explanation legally sufficient, because the ALJ provided adequate reasons to discredit Nurse Boyles's opinion. Further, the Court's own review of the record finds substantial evidence to support the ALJ's assignment of weight.

Indeed, physicians almost always described Plaintiff as in "no acute distress." (R. at 313, 331, 337, 341, 344, 349, 353, 355, 361, 364, 366, 368, 384, 407, 409.) On January 6, 2010, a treating physician described no instability in Plaintiff's spine. (R. at 307.) On October 1, 2013, a treating physician reported that Plaintiff's back had a full range of motion with no tenderness upon palpation. (R at 313.) And Plaintiff exhibited a normal gait on the few occasions that his physicians described it. (R. at 368, 472, 475.)

Notably, the final report from Plaintiff's August 14, 2014 x-ray noted only "mild diffuse [degenerative disc disease]." (R. at 391.) And, on May 2, 2016, Plaintiff's insurance denied him an MRI for his back, because his doctor had not yet attempted conservative treatment. (R. at 482.) On May 18, 2016, Plaintiff underwent an electromyography ("EMG") to assess the health of the muscles and nerves of his lower extremities and received "grossly normal" results. (R. at 481.) Similarly, Plaintiff's treating physicians repeatedly found Plaintiff's musculoskeletal system to be "grossly normal." (R. at 431, 436, 444, 452, 457.)

33

Moreover, as the ALJ correctly noted, despite Nurse Boyles's conclusion that Plaintiff qualified as totally and permanently disabled and unable to work as of May 2008, Plaintiff's earning reports document that he in fact worked as a diesel mechanic through January 2010. (R. at 222-29.) And the report completed by Plaintiff's sister documented that Plaintiff retained the ability to watch television, prepare his own meals, drive and run errands, demonstrating some ability to walk, sit and lift. (R. at 28, 243, 245-48.) Similarly, in his own function report, Plaintiff reported that he could sit in his recliner and watch television, load the dishwasher, drive and walk 50 to 100 feet before needing to stop and rest. (R. at 255, 257-60.)

Together, the objective medical evidence, Plaintiff's earning reports and the statements by Plaintiff and his sister support the ALJ's assignment of little weight to Nurse Boyles's opinion. Because the ALJ properly explained the weight afforded to Nurse Boyles's opinion, and because substantial evidence supports the ALJ's assignment of weight, the ALJ did not err.

**D.  In Formulating Plaintiff's RFC, The ALJ's Failed to Account for His Step-Three Finding that Plaintiff Experienced Moderate Limitations in Maintaining Concentration, Persistence and Pace.**

Plaintiff argues that the ALJ erred in failing to include in his RFC adequate limitations regarding his ability to maintain attendance, concentration, persistence and pace and to interact with others. (Pl.'s Mem. at 16-18.) Defendant responds that substantial evidence supports the ALJ's RFC assessment. (Def.'s Mem. at 26.)

After step three of the analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1). In analyzing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. § 404.1545(b). Generally,

34

the claimant bears the responsibility to provide the evidence that the ALJ utilizes in making his RFC determination; however, before making a determination that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary. § 404.1545(a)(3). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that have basis on the claimant's credible complaints. § 404.1545(e). The ALJ must conduct a function-by-function analysis in assessing a claimant's RFC, and remand may be appropriate in cases where the ALJ fails to assess a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains inadequacies that frustrate meaningful review. *Mascio*, 780 F.3d at 635-36. The assessment must include a narrative discussion of how the evidence supports each conclusion, citing specific medical facts and non-medical evidence, including daily activities and observations. SSR 96-8p.

Relevant here, if the ALJ finds that the claimant has moderate limitations in maintaining concentration, persistence or pace at step three, the ALJ must address those limitations when formulating Plaintiff's RFC. *Mascio*, 780 F.3d at 638. Post-*Mascio*, reviewing courts must ensure that ALJs have appropriately accounted for those limitations in formulating the RFC. *See Kearson v. Colvin*, 2016 WL 4318968, at *5-6 (E.D. Va. Aug. 12, 2016) (finding that the RFC inadequately accounted for the plaintiff's moderate difficulties); *see also Handy v. Comm'r*, 2015 WL 9302972, at *3 n.4 (D. Md. Dec. 22, 2015) (explaining the distinction between moderate limitations and mild or no limitations). However, the Fourth Circuit in *Mascio* did not hold that a finding of moderate limitations in concentration, persistence or pace at step three must automatically translate into a RFC limitation. *Mascio*, 780 F.3d at 638. Instead, the ALJ may exclude those mental limitations from the RFC if he explains why the limitations do not

affect the claimant's ability to work. *Id.* Without this explanation, the Court must remand the ALJ's decision. *Id.*

Here, at step three, the ALJ found that Plaintiff experienced moderate limitations in maintaining concentration, persistence and pace. (R. at 21.) However, in assessing Plaintiff's RFC, the ALJ limited Plaintiff to simple, routine, repetitive tasks not in a production-based setting, occasional interaction with supervisors and co-workers, and no interaction with the public, (R. at 22), none of which account for Plaintiff's ability to stay on task at a sustained rate. *See Thomas v. Berryhill*, 916 F.3d 307, 312 n.5 (4th Cir. 2019) (restricting a claimant to non-production rate or demand pace settings without further explanation frustrates meaningful review, because it fails "to establish for how long, and under what conditions, [the claimant] is able 'to focus [her] attention on work activities and stay on task at a sustained rate.'" (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00E(3))); *Ollis v. Berryhill*, 2017 WL 7167171, at *12 (E.D. Va. Dec. 18, 2017) (restricting a claimant to limited interaction with the public and co-workers does not satisfy *Mascio*, because the limitation addresses "[the claimant's] social functioning, rather than his additional, moderate limitations in concentration, persistence, and pace" (collecting cases)), *report and recommendation adopted*, 2018 WL 627386 (E.D. Va. Jan. 30, 2018); *Handy v. Comm'r, Soc. Sec. Admin.*, 2015 WL 9302972, at *3 (D. Md. Dec. 22, 2015) (limiting plaintiff to "simple, routine, repetitive tasks involving short, simple instructions in an environment with few workplace changes, no public contact, and only brief, infrequent contact with supervisors and co-workers not requiring teamwork or collaboration" did not account for plaintiff's moderate limitations in concentration, persistence and pace).

Neither did the ALJ properly explain why Plaintiff's moderate limitations in concentration, persistence and pace translated into no additional RFC limitations. Discussing the

medical evidence, the ALJ noted that Plaintiff received only conservative treatment for his mental impairments during the relevant time period. (R. at 25.) The ALJ highlighted that the record mentioned counseling and therapy, but otherwise included no appointments with a mental health specialist or inpatient treatment for mental health diagnoses. (R. at 25.) The ALJ specifically mentioned Plaintiff's May 23, 2015 appointment at Amelia Healthcare Center, during which Plaintiff declined an offer for an SSRI prescription to supplement the Xanax that he took for his anxiety and depression. (R. at 25, 407-408.)

An ALJ's discussion of normal mental health status examinations and unremarkable mental health treatment records can satisfy the ALJ's duty to explain why a claimant's moderate limitations in concentration, persistence and pace translate into no additional RFC limitations. *Mascio*, 780 F.3d at 638. For example, in *McCornell v. Berryhill*, the District of South Carolina explained that:

> Although the ALJ did not explicitly state that Plaintiff had no difficulty staying on task, he cited evidence that supported such a conclusion. He specified that "[t]reatment records reflect[ed] that the claimant ha[d] displayed alert and oriented presentation, intact attention, fair judgment and insight, logical and goal-directed thought processes, normal thought content, intact concentration, intact memory, and intact associations." He pointed out that only one treatment note had shown "circumstantial thought process, poor judgment, poor remote memory, easily distracted, and mildly impaired concentration." He concluded that "most of the clinical findings ha[d] been normal and that most of Plaintiff's statements suggested he was doing well on medication [sic]."

2018 WL 2244620, at *11 (D.S.C. May 16, 2018) (citing *Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017)), *aff'd sub nom. McCornell v. Comm'r of Soc. Sec. Admin.*, 748 F. App'x 514 (4th Cir. 2019).

However, the ALJ here referred only to Plaintiff's conservative treatment and an occasion where Plaintiff chose not to accept a supplemental prescription. (R. at 25, 407-08.) The conservative nature of Plaintiff's mental health treatment, alone, fails to explain why

37

Plaintiff's moderate limitations in maintaining concentration, persistence and pace translated into no additional RFC limitations, especially considering that the ALJ included other mental and social limitations in Plaintiff's RFC despite that same treatment. (R. at 22.)

The ALJ's failure to account for Plaintiff's ability to concentrate, persist and maintain pace proves particularly deficient, because the ALJ afforded great weight to the opinions of state agency psychologists [9] David Deaver, Ph.D., and Sreeja Kadakkal, M.D., both of whom opined that Plaintiff experienced concentration, persistence and pace limitations. (R. at 26, 121, 136.) The ALJ found that Plaintiff's testimony and the objective medical evidence supported the limitations assessed by both doctors, but did not include all of the limitations that both doctors endorsed — namely, the limitations in Plaintiff's ability to maintain concentration, persistence and pace — in Plaintiff's RFC.[10] (R. at 26.) Moreover, in discounting the opinions of Dr. Sprecher, who also endorsed concentration, persistence and pace limitations, the ALJ explained that the record did not support the "extent" of the concentration and memory limitations assessed by Dr. Sprecher; however, the ALJ failed to clarify to what extent, if any, Plaintiff's impairments in fact limited his concentration and memory. (R. at 27, 460, 466.)

---

[9]     State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. § 404.1513a(b)(1). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. § 404.1513a(b)(1). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ is required to explain the weight given to state agency opinions. § 404.1527(e).

[10]     Notably, both Dr. Deaver and Dr. Kadakkal found that Plaintiff experienced moderate difficulty maintaining regular attendance, (R. at 121, 136), which the ALJ likewise failed to adopt into Plaintiff's RFC despite finding that the evidence of record supported the limitations endorsed by both doctors, (R. at 22, 26). This creates a similar logical deficiency in the ALJ's opinion that the ALJ should address on remand.

Ultimately, because the Court is "left to guess" why the ALJ included no concentration, persistence and pace limitations in Plaintiff's RFC despite his step-three findings to the contrary, the Court must remand. *Mascio*, 780 F.3d at 638; *see also Monroe*, 826 F.3d at 191 (emphasizing ALJ's duty to "build an accurate and logical bridge from the evidence to [her] conclusion" (quoting *Clifford*, 227 F.3d at 872)); *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) (noting that the reviewing court cannot "speculate as to how the ALJ applied the law to its findings or . . . hypothesize the ALJ's justifications that would perhaps find support in the record).

### E.     The ALJ's Error in Assessing Plaintiff's RFC Precludes Meaningful Review of the ALJ's Step-Five Conclusion.

Finally, Plaintiff challenges the ALJ's step-five conclusion that Plaintiff could perform work existing in significant numbers in the national economy. (Pl.'s Mem. at 20-22.) Specifically, Plaintiff argues that: (1) the single job of laundry folder with 10,000 positions nationally does not constitute a significant number of jobs; and, (2) the VE did not offer any evidence regarding how many of these jobs exist in the relevant region. (Pl.'s Mem. at 21.) Defendant responds that the Commissioner satisfied his burden, because 10,000 jobs constitutes a significant number and the relevant regulations and caselaw do not require VEs to testify to job positions available in a claimant's specific region. (Def.'s Mem. at 28.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant could perform other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 404.1566. The Commissioner can carry her burden in the final step with the testimony of a VE. § 404.1566(e). During an administrative hearing, the ALJ must pose hypothetical questions to the VE that accurately represent the claimant's RFC, so that the VE can offer testimony about

39

any jobs existing in the national economy that the claimant could perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).

Here, the ALJ found that Plaintiff had the RFC to perform light work with additional limitations. (R. at 30.) The ALJ posed a hypothetical to a VE to determine whether jobs existed in significant numbers in the national economy that Plaintiff could perform given his age, education, work experience and RFC. (R. at 30.) The VE testified that, in light of his restrictions, Plaintiff could perform the representative occupation of laundry folder, of which there exists approximately 10,000 positions in the national economy. (R. at 30.) The ALJ then determined that the VE's testimony proved consistent with the *Dictionary of Occupational Titles*. (R. at 30.)

The Court cannot assess whether substantial evidence supports the ALJ's step-five conclusion, because the ALJ failed to address Plaintiff's moderate limitations in concentration, persistence and pace in formulating Plaintiff's RFC, as previously discussed. *See Walker*, 889 F.2d at 50 (noting that a hypothetical proves "relevant and helpful" only when it accounts for all of a claimant's substantiated impairments). Therefore, the Court cannot determine whether the laundry folder position accurately reflected Plaintiff's abilities, precluding meaningful review of the ALJ's step-five conclusion.

## V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF Nos. 11, 12) and Motion to Remand (ECF No. 13) be GRANTED, that Defendant's Motion for Summary Judgment (ECF No. 15) be DENIED and that the final decision of the Commissioner be VACATED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g).

decision of the Commissioner be VACATED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Let the Clerk forward a copy of this Report and Recommendation to United States District Judge M. Hannah Lauck and all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/_____
David J. Novak
United States Magistrate Judge


Richmond, Virginia
Date: September 4, 2019